IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

JACKI PICK,

        Plaintiff,

vs.

BRADLEY JAY RAFFENSPERGER,

        Defendant.

CASE NO. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Jacki Pick hereby sues Defendant Bradley Jay Raffensperger for defamation as follows.

### Introduction

Brad Raffensperger defamed Jacki Pick by publishing statements that falsely accused Ms. Pick of presenting "**deceptively sliced and edited**" video footage and "**lies**" in testimony before the Georgia state legislature when, in fact, Ms. Pick's presentation of the unedited, uncut, November 3, 2020, video at State Farm Arena revealed that Raffensberger had spent weeks lying about what had really happened at State Farm Arena on election night.

Raffensperger further claimed that Ms. Pick lied about Fulton County's use of "**suitcases**" to store ballots, when he was aware this was term was field jargon among election workers. The term had been used by the state's own election monitor for Fulton Co. in a report to the Georgia State Board of Elections – on which Raffensperger sits ex-officio.  Ms. Pick's testimony was true and her evidence

unedited and authentic, as Raffensperger has known from the start. He made these statements in his book <u>Integrity Counts</u> and subsequent national promotional interviews, from which he profited. Raffensperger's allegations about Ms. Pick were knowingly false, defamatory, made with actual malice, and have caused Ms. Pick severe damage for which she seeks to be made whole.

## Jurisdiction, Parties, and Venue

1.     Plaintiff Jacki Pick is a Texas citizen and resident. She served many years on Capitol Hill as legal counsel to the Chairman of the U.S. House Subcommittee on the Constitution and the former Ranking Member of the U.S. House Commercial and Administrative Law Subcommittee. In these capacities, she advised on the oversight of federal agencies. At the time of her testimony before the Georgia state legislature, she was a Senior Fellow at the Texas Public Policy Foundation. She hosts an educational podcast on multiple media platforms. She has devoted her professional and civic life to upholding and defending the U.S. Constitution. She loves her country and volunteered after election 2020 to defend its rule of law and its free and fair elections.

2.     Defendant Bradley Jay Raffensperger is a citizen and resident of the state of Georgia. He is sued in his individual capacity as the author of <u>Integrity Counts</u> ("Book"). This Court has personal jurisdiction over Raffensperger because he sold the Book to Texans through online booksellers and physical stores located in Texas. Raffensperger promoted Book sales through national media outlets that broadcast to the Texas market.

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between Jacki Pick and Brad Raffensperger and the amount in controversy exceeds $75,000.

4.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omission giving rise to the claim occurred in this District and because the brunt of the reputational harm was experienced by Ms. Pick in the Northern District, which is Ms. Pick's home district.

## Satisfaction of Condition Precedent

5.     Ms. Pick has provided notice to Raffensperger as required by Tex. Civ. Prac. & Rem. Code §73.055 and satisfied all conditions precedent to the filing of this lawsuit. At the time of filing, Raffensperger has neither published a retraction, refutation, or apology, nor taken steps to remove the Book from the market.

## Factual Background

### Election Night 2020

6.     Georgia Code § 21-2-522(1) (2020) states the result of an election may be contested on the grounds of "[m]isconduct, fraud, or irregularity by any … election official or officials sufficient to change or place in doubt the result." "Whenever the court trying a contest shall determine that the primary, election, or runoff is so defective as to the nomination, office, or eligibility in contest as to place in doubt the result of the entire primary, election, or runoff for such nomination, office, or eligibility," the court "declare[s] the primary, election, or runoff to be invalid . . . and

shall call for a second primary, election, or runoff to be conducted among all of the same candidates . . . ." Georgia Code §21-2-527.

7.      Georgia Code §21-2-483(b) (2020) states that "[a]ll proceedings" at tabulation centers "shall be open to the view of the public." Georgia law requires that returns "be open to public inspection at the office of the superintendent as soon as they are received from the chief managers." Georgia Code § 21-2-491. Furthermore, Georgia Code § 21-2-492 (2020) required that the superintendent give "at least one week's notice prior to the primary or election by publishing same in a conspicuous place in the superintendent's office, of the time and place when and where he or she will commence and hold his or her sessions for the computation and canvassing of the returns . . . ."

8.      In short, Georgia law both allows members of the public to be present when votes are being counted and requires election officials provide notice regarding when ballots will be counted.

9.      Witness affidavits and press reports provide the following facts about election night at State Farm Arena: a person who appeared to be an election supervisor announced to the room of election workers, press, and partisan observers at approximately 10:00 p.m. that counting at State Farm Arena would stop at 10:30 p.m. and begin again the next morning at 8:30 a.m. A second official, the Fulton County Public Affairs Manager, confirmed this understanding with the press and at least one partisan observer.

10.     Multiple contemporaneous press accounts confirm this announcement.

<u>ABC News</u> (November 3, 2020, 10:34 p.m.)



**ABC News Politics** ✔
@ABCPolitics

NEW: The election department sent the ballot counters at the State Farm Arena in Atlanta home at 10:30 p.m., Regina Waller, the Fulton County public affairs manager for elections, tells ABC News.

<u>The Atlanta Journal-Constitution</u> (November 3, 2020)

([https://www.ajc.com/news/atlanta-news/fulton-election-results-delayed-after-pipe-bursts-in-room-with-b%20allots/4T3KPQV7PBEX3JVAIGJBNBSVJY/](https://www.ajc.com/news/atlanta-news/fulton-election-results-delayed-after-pipe-bursts-in-room-with-b%20allots/4T3KPQV7PBEX3JVAIGJBNBSVJY/))

They planned to stop scanning absentee ballots at 10:30 p.m. and pick it up back in the morning. No official could explain before press time why Fulton was stopping its count of absentee ballots at that time, only saying that was the procedure.

11.     Two election observers from the Republican Party of Georgia were present at State Farm Arena election night. Their accounts, found in affidavits signed under penalty of perjury, also averred that they heard the announcement that counting would cease at 10:30 p.m. and resume at 8:30 a.m. on November 4.  True and correct copies of affidavits from election observers Mitchell Harrison and Michelle Branton are attached as Exhibits A and B. The individual who made the announcement to the observers appeared to be an election supervisor.

<u>Election Observer 1, Mitchell Harrison (Affidavit Attached as Exhibit A)</u>

there.   Trevin and I thought that was odd because at 10:30 P.M., Regina Waller and the supervisor lady had said they were done counting for the night, and would not resume until 8:30 A.M. the next morning.

12.   Georgia law does not give observers the right to remain in ballot counting facilities outside of times for "proceedings," such as when ballots are being processed. Therefore, the partisan election observers and the press had no choice but to leave State Farm Arena shortly after officials said vote tabulation would cease at 10:30 p.m. The affiant election observers were the last to leave the public observation area. Before they left, they made three separate requests for a standing vote count. Election officials refused to provide them with a count.

13.   The affiant observers later learned that, despite the multiple announcements that counting was done for the evening, counting had in fact resumed at State Farm Arena without notice and without any members of the public being present. When the observers learned about this, one of them, along with a second witness, returned to State Farm Arena around 1:45 a.m.   Security personnel confirmed that a few individuals had remained after 10:30 p.m. and continued working up until just minutes before the observers returned. It was later learned that ballot counting had resumed around 11:03 p.m. and ended again around 1:00 a.m. Neither the observers nor candidate representatives were given notice that counting was to resume.

Plaintiff's Limited Involvement in the Election Contest

14.     Ms. Pick lives and works in Dallas, Texas and is well known through her podcast, philanthropic activities, political involvement, and otherwise. Until the defamatory statements complained of herein, she enjoyed a well-earned reputation for being an honest and credible voice in her personal and professional communities.

15.     Ms. Pick has long had a personal interest in protecting citizens' votes. She has worked on and volunteered in elections as far back as 1994. During her tenure as counsel in the House of Representatives, her issue portfolio for the Chairman of the U.S. House Subcommittee on the Constitution included voting rights and election law, issues to which she has devoted literally hundreds of hours of work and study.

16.     Shortly after the 2020 election, Ms. Pick volunteered to assist with election related matters in the state of Georgia.

17.     In her capacity as a volunteer, Ms. Pick helped organize and summarize investigative facts and affidavits from approximately 100 witnesses who believed they had viewed irregularities, misconduct, and potential fraud in the administration of the November 3, 2020, election. At least two of those affidavits concerned perceived irregularities in ballot processing at State Farm Arena on November 3 and November 4, 2020.

18.     On information and belief, on the afternoon of December 2, 2020, Atlanta attorney Ray Smith (the attorney litigating the election contest), obtained raw, uncut, unedited video footage of the vote processing and tabulation at State Farm Arena on November 3 and November 4, 2020, ("State Farm Video") which had,

upon information and belief, become available to him for the first time. The video file spanned greater than twenty hours, and took, upon information and belief, numerous hours to download. The video did not become available to view until around 1:00 a.m. Upon information and belief, neither the Trump campaign nor the Georgia Republican party had viewed the State Farm Video prior to December 3.

19.     The more than twenty hours of State Farm Video footage appeared to verify the affiant election observers' claims. While the video did not include sound, it showed what appeared to be an election official make an announcement to observers around 10:00 p.m.; press, observers, and most workers leaving around 10:30 p.m.; four to six officials or workers (including the person who made the announcement to the observers) staying behind after the observers and workers had already left; and those remaining persons beginning to tabulate ballots again around 11:03 p.m. The video appeared to show workers tabulating ballots from approximately 11:03 p.m. until around 1:00 a.m. No members of the public such as observers or press were present during this timeframe even though Georgia law gives the public the right to be present. The absence of press is notable because Georgia—a swing state whose votes had not yet fully been reported—was the focus of intense media interest at precisely this time. At approximately 11:52 p.m., an election monitor (whose presence was mandated because of prior incompetence and malfeasance in Fulton County) arrived. When the monitor arrived on scene, the video appears to show him agitated. He began taking photos of the scanner area, and then placed a phone call. Minutes

later at 12:15 a.m., the Deputy Chief Investigative Officer for the Secretary of State's office arrived at the facility and had a conversation with the monitor.

20.     Only twelve hours after the law firm first viewed the video, the Georgia State Senate Election Law Subcommittee held a hearing to learn about alleged election irregularities, misconduct, or potential fraud in the 2020 election.[1] Despite not having had enough time to view the entirety of the video footage, which spanned more than twenty-hours, Ms. Pick and others believed the video corroborated the press and affiants' claims of irregularities potentially indicating a violation of Georgia law. Two hours before the hearing, Ms. Pick was asked if she would narrate the video at the hearing to explain how various points in the raw footage corroborated witness affidavits that the firm attached as exhibits to their lawsuit.

21.     While Ms. Pick is an attorney, she stressed at the beginning of her testimony that she was appearing as a volunteer and not as a lawyer. Ms. Pick was not retained as counsel for the Trump legal team. Rather, she was a volunteer helping a team led by Atlanta attorney Ray Smith with fact gathering.

22.     As part of Ms. Pick's presentation—which lasted approximately a half hour—she fast forwarded or rewound the video to point out relevant time frames identified in the witness affidavits. It would have been physically impracticable and a waste of the Committee's time to have played the entire twenty-hour plus video, most of which was irrelevant.

---

[1] A video of the December 3, 2020, hearing is publicly available at https://www.youtube.com/watch?v=hRCXUNOwOjw.

23.     The video was raw, uncut, and unedited. No part of the video was deleted or removed. The full video was in the hearing room and available to the Committee to review or request to review.  Ms. Pick did not play excerpts or snippets of a video that were spliced together, but instead was fast-forwarding and rewinding on a single, hours-long, video file.  On the hearing video, she can be heard instructing the audio-visual technician multiple times to "fast-forward" or "back up" to various times on the video, as is obvious from either the video or the transcript of her presentation. The full video became public after the hearing.  Raffensperger later made public statements that his office had seen the video before the hearing, so he knew Ms. Pick's presentation of the video was raw and unedited.

24.     Ms. Pick's testimony referred the Committee to various points of the video that proved out the contents of the election observers' affidavits.

25.     Ms. Pick also used vernacular during her presentation that was used by Fulton County elections staff and monitors. This included the term "**suitcases**" to describe the containers in which State Farm Arena election officials stored the Fulton County ballots. The November 2020 affidavit of veteran Fulton County election worker Bridget Thorne stated that the ballots were "gathered in suitcases."  *See* Exhibit C, ¶ 23.

26.     Ms. Pick reviewed Ms. Thorne's affidavit many times in the days prior to her testimony. Thorne's affidavit is where Ms. Pick learned that the local staff referred to the containers in question as "suitcases." Thorne's affidavit was served to Raffensperger himself who was the defendant in the case for which the affidavit was

created.  Upon information and belief, the gray containers in the photograph below hold poll pads while the black containers—or "suitcases" as the election workers referred to them—held ballots on election night.  As the state's own election monitor explained in his report to the State Board of Elections, State Farm Arena had "too many ballots coming in for secure black ballot boxes," so they resorted to bringing ballots in "rolling bins" creating potentially a "massive chain of custody problem.  It is my understanding that the ballots are supposed to be moved in numbered, sealed boxes to protect them."



27.   Ms. Pick explained to the panel that, as the firm had only had the ability to view the video at 1:00 a.m. and the hearing was a mere twelve hours later, there had been no opportunity in those twelve hours to speak to Fulton County officials or others about the contents of the video.

28.   When Ms. Pick did not have the answer to a question, she let the panel know and properly qualified her testimony multiple times where appropriate. She

further testified that there were unanswered questions that the firm would be able to answer with more time to review the full video footage. The firm literally had not had possession of the video long enough to have watched it all the way through.

29.     Ms. Pick never stated that the video proved specific intent to commit voter fraud. She did not name election workers or allege that any particular individual committed a crime.  As referenced in the statute above, no proof of fraud was necessary for the election contest and certainly not for her testimony which aimed to raise questions and inform the public about a matter of great public concern. Her testimony focused solely on questions and potential irregularities that anyone could observe from the video and match to the claims made in witness affidavits. Her observations were truthful and accurate based on the knowledge she had at the time of her testimony.

30.     During the presentation, Ms. Pick offered to show members of the Committee more of the video. Someone within the hearing room—believed to be the hearing chairman—is heard questioning whether members of the panel would like to see more of the video and then declining Ms. Pick's offer. At multiple points Ms. Pick also invited and answered questions from Committee members.

31.     Ms. Pick was the only witness to present the video before the Committee.

32.     Ms. Pick's statements were factually correct and corroborated by multiple press accounts from Nov. 3-4, 2020, multiple witness affidavits, the report of the state's own election monitor for Fulton County, and the video which speaks for itself.

<u>Raffensperger Defames Ms. Pick</u>

33.    In the days and months after the December 3 hearing, Raffensperger, his staff, and surrogates began a campaign to malign Ms. Pick. Raffensperger claimed Ms. Pick presented "deceptively sliced and edited" video or "doctored" the video and presented false testimony.  Raffensperger wrote a book entitled "Integrity Counts," distributed by Simon & Schuster in Texas and elsewhere. On the Simon & Schuster website page advertising the Book, there is a link to various booksellers where Texas residents can purchase the Book, including via Amazon and several brick-and-mortar stores within Texas. Raffensperger sold multiple copies of the Book in Texas.

34.    In the Book, Raffensperger refers to the video presented to the Committee as a "SLICED-AND-DICED VIDEO." Raffensperger states that the State Farm Arena video—presented to the Committee by Ms. Pick alone—"had been ***deceptively sliced and edited so that it appeared to show the exact opposite of reality***." Book, p. 138 (emphasis added). That is, he called Ms. Pick a liar and accused her of actions constituting a crime under Georgia law.

35.    Raffensperger further claimed that Ms. Pick's presentation "***showed a slice of video*** that had ***removed the clear evidence*** that Fulton County election workers had protected the ballots and the process as required by law." Raffensperger later again referred to the video as a "***chopped-up video***." Book, p. 139 (emphasis added).

36.    In later public statements, Raffensperger described the video shown by Ms. Pick as "doctored" and "false."

37.     Raffensperger's statements are false and were intended to discredit and defame Ms. Pick. While Raffensperger attributes many of his comments regarding the State Farm Video to the president's personal lawyer, Rudy Guiliani, Ms. Pick was the only witness to present the video to the panel. Rudy Giuliani did not. (Ms. Pick was not affiliated with or working for Rudy Guiliani, and they did not communicate or coordinate their respective December 3, 2020, testimonies). Upon information and belief, Giuliani was President Trump's personal counsel and not part of the firm with which Ms. Pick had been volunteering or part of the legal team litigating the Georgia election contest. Raffensperger's disparaging comments about the "deceptive," "chopped-up," "doctored" video presentation which "removed…clear evidence" "so that it appeared to show the opposite of reality" could only be referring to Ms. Pick.

38.     The Book further made statements that Raffensperger's office and his surrogates had to "punch down lies" to correct Ms. Pick's description of "official boxes" containing ballots as "suitcases" or "secret suitcases." Book pg. 138, 144, 146. It further suggested that someone who would use such a term lives "in a world outside of reason and reality." These characterizations were false and defamatory, as Raffensperger was aware the term "suitcases" was used by Fulton County election workers and his own election monitors.

39.     The defamatory statements are "of and concerning" the Plaintiff.  Ms. Pick was the only person who presented the State Farm Arena video, despite Raffensperger's repeated knowingly false statements that it was Rudy Giuliani. The publicly available hearing video and transcript clearly show Ms. Pick was the only

one presenting the video. Raffensperger had knowledge of the truth or showed reckless disregard for the truth regarding his characterizations of the State Farm Arena video at the December 3, 2020, hearing. Further, after hearing Raffensperger's claims that the December 3, 2020, video was an attempt to lie to the legislature, persons acquainted with Ms. Pick independently informed her they believed Raffensperger's statements defamed Ms. Pick. Finally, Ms. Pick's image was seen in videos and photos of her December 3, 2020, testimony that went viral with millions (perhaps tens of millions) of views worldwide, on national network television broadcasts, and in newspapers and online news outlets.

40.     The video Ms. Pick showed on December 3 was raw, uncut footage. It was not edited *at all*, let alone "deceptively edited," 'doctored," or "sliced and diced." Ms. Pick truthfully and honestly explained to the Committee that she and the firm had literally not had sufficient time to review all the video. She also offered Committee members the opportunity to view more of the footage during her testimony, and they declined her offer. Further, the Committee upon information and belief, had access to the video in its entirety after the presentation.

41.     The law firm took the entire, unedited video to the State Capitol for the presentation to the Georgia Legislature. The film shown and the manner of its presentation was and is a matter of public record.  Ms. Pick's testimony to the Georgia Legislature was a matter of public record. As of October 2022, the Georgia Legislature has a link to Ms. Pick's video presentation available on its website. Upon information and belief, Raffensperger viewed the video of the hearing, and therefore had actual

knowledge his statements about the video were false. In the alternative, it shows a reckless disregard for the truth for him to claim the presenter of the video was lying to the legislature without actually having viewed the testimony described.

42.     Raffensperger's defamatory statements were calculated to, and did, harm Ms. Pick's reputation, lowered her in the estimation of the community, and will deter third persons from associating or dealing with her.

43.     Raffensperger has thus far refused to retract or correct the defamatory statements, despite knowing of their falsity.

44.     Raffensperger wrote the Book in his personal capacity, to aid in his reelection efforts and, upon information and belief, has personally profited from the Book's sales.

## Damages

45.     Raffensperger's defamatory statements caused Ms. Pick actual damages.

46.     As a result of Raffensperger's defamatory statements, Ms. Pick has suffered reputational damages in her personal and private life. She is a licensed but non-practicing attorney and podcaster, and her professional success depends on a reputation for truthfulness and honesty.

47.     Before Raffensperger's defamatory statements, Ms. Pick enjoyed a good reputation in her community and had even been approached for high-level governmental and other influential positions. Because of Raffensperger's defamatory statements, her reputation for truthfulness and honesty has been irreparably

damaged, and she likely is no longer a viable candidate for political or professional appointments.

48.     Raffensperger's defamatory claims regarding Ms. Pick have also repeatedly been parroted in the news media at the highest level concerning one of the biggest media events in American history. Google searches of her name return pages of results repeating the Book's defamatory allegations. Regardless of if Raffensperger acts to retract, repudiate, or correct his defamatory statements, there is no way to correct every repetition of his false claims. Further, he cannot undo the life sentence of reputational damage sustained from false statements made on live television broadcasts and other media appearances.

49.     Raffensperger's defamatory claims have been so destructive that Ms. Pick is now being investigated by the Fulton County District Attorney's office for knowledge of various alleged crimes in connection with the November 3, 2020, election, including, on information and belief, having made false statements to the legislature. On information and belief, the District Attorney's allegations are based upon or closely mirror the false and defamatory claims made in Raffensperger's Book. Raffensperger knows this because it has been widely reported.  Also, the Atlanta Journal Constitution reported in their coverage of the Fulton County Special Purpose Grand Jury that Raffensperger said the video was "doctored." Despite the knowingly false statements being widely attributed to him in the press, upon information and belief, he has made no efforts to correct them, instead letting an innocent be threatened with prosecution for his lies.

50.     An attempt to subpoena Ms. Pick to testify in Georgia, and Ms. Pick's successful legal action at the Texas Court of Criminal Appeals to protect against that unwarranted legal process, resulted in additional negative press coverage and harm to Ms. Pick's reputation. Upon information and belief, the allegations underlying the Fulton County subpoena can be traced to Raffensperger's false accusations.  Upon information and belief, the only evidence of any alleged wrongdoing by Ms. Pick is the manufactured claim originated by Brad Raffensperger.

51.     If Raffensperger repeated his Book's false accusations to the District Attorney, it demonstrates a pattern of acting in ways that are deceptive or not forthcoming with government officials on the public record.

52.     Raffensperger was chastised by federal Judge Amy Totenberg for giving "far fetched," and "flatly not credible" evidence to a federal court that "contradict[ed] the fulsome expert opinion and evidence." *Curling v. Raffensperger*, Case 1:17-cv-02989-AT,              Document              579,              p.              70. https://www.courtlistener.com/docket/6139924/curling-v-raffensperger/

53.     Similarly, Raffensperger appears to have lied to the Georgia legislature on at least three occasions about the contents of the State Farm Video specifically, and Ms. Pick's presentation is what proved it.

54.     In the Dec. 3, 2020, hearing before the Georgia Senate Subcommittee, Senator Elena Parent states on the record that the Secretary of State's office told the Subcommittee only an hour before Ms. Pick's testimony that the Secretary of State

had a state monitor present on election night at State Farm Arena the "whole time" or "entire time."  The video proved this false.

55.     A week later at a Georgia House hearing, State Rep. Scot Turner stated that Raffensperger sent two writings to the legislature that falsely claimed—in bold face print no less—that an election monitor was present at State Farm Arena while all counting took place.  Rep. Turner held up a November 12, 2020, hard copy letter repeating the false claim signed by Raffensperger, and also referenced a November 19, 2020, email from Raffensperger making a substantially similar claim.  According to the hearing transcript and video of this December 10, 2020, hearing, the Representative believed Raffensperger's prior representations until he saw the video presented by Ms. Pick which proved that the state monitor was not present when counting resumed at State Farm Arena on election night.  Rep. Turner investigated further and found that the state monitor admitted this in a FactCheck.org article dated Dec. 4, 2020.  This video testimony by Rep. Turner is linked in the Georgia Legislature      website      and      is      found      at      6:17:30      on https://www.youtube.com/watch?app=desktop&v=9EfgETUKfsI&feature=youtu.be In the words of Rep. Turner, "The changing nature of the information that we have been getting as legislators from the Secretary of State's office has been most disappointing…The video comes out…debunking the claims in the  video from [Raffensberger's] Senate testimony,…They changed the story without even acknowledging they changed the story. That damages credibility.  We have to be better than that…this is the best part. The Deputy Secretary of State told

FactCheck.org that the monitor was not required to be there at all times, but she instructed him to return, after hearing from the new outlets that the county was going to cease counting for the night. *This means that the Secretary of State's office knew the entire time that there was not an observer in the room when ballot scanning was happening and they sent two memos to us saying that there was. The story doesn't add up. Somebody isn't telling the truth*." That "somebody" not telling the truth was Raffensperger.

56.     Later, the Chief Operating Officer of the Georgia Secretary of State's office, Gabriel Sterling, also contradicted the Secretary of State when he admitted publicly that the State Monitor had not been present for a considerable period of time while counting was taking place. But for Ms. Pick's testimony, it is entirely possible that Raffensperger's lies to the legislature and others would never have been found out.

57.     Ms. Pick has suffered embarrassment, stress, humiliation, and mental anguish because of Raffensperger's defamatory statements. This mental anguish has resulted in sleeplessness, anxiety, and has significantly affected Ms. Pick's enjoyment of life. Ms. Pick has sought counseling. The time since Raffensperger published his Book has been the most emotionally challenging of Ms. Pick's life.

58.     Ms. Pick has also suffered physical injury and pain because of Raffensperger's defamatory campaign. The stress caused by Raffensperger's defamation exacerbated her pre-existing medical conditions including her heart arrythmia—for which she has already undergone two heart procedures—and a

condition that causes damage to her voice and her ability to speak. She lost ten pounds due to stress, chronic mental and physical fatigue, and exhaustion.

59.     Ms. Pick has lost months of her life addressing legal issues precipitated by Raffensperger's defamation campaign and has accrued enormous sums in legal fees defending against subpoenas that have, upon information and belief, been precipitated and perpetuated by Raffensperger's false claims. Ms. Pick has expended and will continue to expend an enormous amount of time and money repairing her reputation, including working with reputation management professionals, attorneys to request retractions, and whatever else is needed to restore her good name. However, she knows that, no matter how much time and money she spends, she cannot unring the bell on the defamatory accusations that Raffensperger thrust into the national public debate.

## Count 1—Defamation

60.     Ms. Pick incorporates the preceding paragraphs as if set forth herein verbatim.

61.     Raffensperger published false statements in his November 2, 2021, Book claiming Ms. Pick presented deceptively edited video to the Georgia legislature. In fact, Ms. Pick played raw, uncut, unaltered video, the file of which spanned more than twenty hours in full. Ms. Pick did not edit the video at all.

62.     Raffensperger also falsely accused Ms. Pick of lying that the Fulton County election officials stored ballots in "suitcases," when that was the exact terminology for ballot transfer bags used by Raffensperger's own state election

monitor in his November 13, 2020, report to the Georgia State Board of Elections. It was also the term poll worker Bridget Thorne used to refer to the ballot transport bags in her November 2020 affidavit made in connection with a lawsuit against Raffensperger.  Ms. Pick's testimony December 3, 2020, testimony came after both of these affiants statements were already matters of public record.

63.     Raffensperger's statements were of and concerning Ms. Pick as Ms. Pick was the only individual to show the video at the December 3, 2020, hearing. Claims that someone presented a deceptively edited video from State Farm Arena could refer to no one other than Ms. Pick.

64.     Raffensperger made his statements with actual malice, full knowledge that his statements were false or with reckless disregard for the truth or falsity of his statements. Raffensperger has repeatedly and publicly claimed that he or his agents watched the State Farm Video and the December 3, 2020, testimony before the Committee. He knew his statements suggesting the State Farm Video was deceptively edited were false when he made them. By virtue of the affidavit signed by a veteran poll worker and served on him in December 2020 in the *Trump v. Raffensperger* election contest, he also was aware that the term "suitcase" was a term utilized by Fulton County election administrators and the State's own election monitor to describe where Fulton County stored their ballots.

65.     Ms. Pick pleads actual malice as to all of the defamatory statements identified above—both those in the Book and after the Book's publication.

Raffensperger's statements were substantially false and gave a defamatory impression by omitting material facts or juxtaposing facts in a misleading way.

66.     Any reasonable person reading the cited statements would construe them to be defamatory.

67.     The "gist" of Raffensperger's statements is that Ms. Pick presented a "deceptively sliced and edited" video "so that it appeared to show the exact opposite of reality" to mislead the Georgia legislature.   Among his many defamatory statements, he more specifically alleges that the deception included "showing a slice of video that had removed the clear evidence that Fulton County election workers had protected the ballot and the process as required by law." He also publishes and republishes statements that she lied about ballots being stored in "suitcases." All of these statements were made with knowledge of the statements' falsity or reckless disregard for the truth or falsity of the statements.

68.     Raffensperger's claims that Ms. Pick's video presentation was deceptive and false could not have a non-defamatory meaning. Neither could Raffensperger's claims that Ms. Pick lied by calling the ballot containers "suitcases" be anything but defamatory.

69.     Raffenspberger's defamatory statements were defamatory per se because they reflect on Ms. Pick's fitness to conduct her business and trade and therefore injured her in her office, profession, and occupation. As discussed above, Ms. Pick produces an educational podcast focused and is, in effect, an opinion journalist. Accusing a journalist of presenting a "deceptively" "sliced-and-diced" or

"chopped-up" video in a deliberate attempt to mislead a government body to attempt to undermine an election goes to the heart of journalistic integrity and is harmful to her in her profession and community. In addition, Ms. Pick is a licensed, non-practicing attorney.

70.     Raffensperger's statements were also defamatory per se because they accused Ms. Pick of committing a crime—false statement to the legislature—for which she is now being investigated, upon information and belief, because of Raffensperger's repeated defamatory falsehoods.

71.     Ms. Pick has suffered damage as a result including, but not limited to, in her personal and professional community, in the press, on social media, and in the courts.

## PRAYER FOR RELIEF

Plaintiff respectfully prays for judgment as follows:

A.  For judgment in her favor against Bradley Jay Raffensperger;

B.  For general, specific, and compensatory damages in excess of $75,000;

C.  For punitive and exemplary damages;

D.  For pre and post judgment interest;

E.  For taxable court costs;

F.  For an apology and retraction; and

G.  All other relief deemed appropriate.

Respectfully submitted,

DHILLON LAW GROUP, INC.

Date: October 31, 2022                    /s/ Matthew Sarelson

                                          Matthew Seth Sarelson, Esq.
                                          msarelson@dhillonlaw.com
                                          Karin M. Sweigart, Esq. (*pro hac vice forthcoming*)
                                          ksweigart@dhillonlaw.com
                                          Christopher Halbohn, Esq.
                                          chalbohn@dhillonlaw.com

                                          **Dhillon Law Group Inc.**
                                          1601 Forum Place, Suite 403
                                          West Palm Beach, FL 33401
                                          T 305.773.1952

                                          *Counsel for Plaintiff*

                                          William G. Whitehill
                                          SBOT # 21356550
                                          bwhitehill@condontobin.com

                                          Condon Tobin Sladek Thornton Nerenberg, PLLC
                                          8080 Park Lane, Suite 700
                                          Dallas, Texas 75231
                                          T 214.265.3862 | F 214.691.6311

                                          *Local Counsel for Plaintiff*